# EXHIBIT O

**DRAFT—SUBJECT TO CHANGE**

A SAD NEW CATEGORY OF ABUSIVE INTELLECTUAL PROPERTY LITIGATION

Eric Goldman[*]

Forthcoming, COLUM. L. REV. FORUM (2023)

ABSTRACT

This paper describes a sophisticated but underreported system of mass-defendant intellectual property litigation called the "Schedule A Defendants Scheme" (the "SAD Scheme"), which occurs most frequently in the Northern District of Illinois. The SAD Scheme capitalizes on weak spots in the Federal Rules of Civil Procedure, judicial deference to IP rightsowners, and online marketplaces' desire to reduce their liability exposure. With substantial assistance from judges, rightsowners use these dynamics to extract settlements from online vendors without satisfying basic procedural safeguards like serving the complaint and establishing personal jurisdiction over defendants. This paper explains the scheme, how it bypasses standard legal safeguards, how it's affected hundreds of thousands of defendants, and how it may have cost the federal courts a quarter-billion dollars. The paper concludes with some ideas about ways to curb the system.

---

[*] Professor of Law, Associate Dean for Research, Co-Director of the High Tech Law Institute, and Supervisor of the Privacy Law Certificate, Santa Clara University School of Law. Website: http://www.ericgoldman.org. Email: egoldman@gmail.com. I appreciate the comments from Sarah Burstein, Colleen Chien, Casey Hewitt, Mark Lemley, Brian Love, Jess Miers, Andrew Oliver, Malla Pollack, Sarah Wasserman Rajec, Lisa Ramsey, Rebecca Tushnet, and participants at the Bay Area IP Profs Works-in-Progress at UC Berkeley Law; the Intellectual Property Scholars Conference (IPSC) at Stanford Law School; and a Santa Clara Law Faculty Workshop. Thanks to Hilary Cheung for her research help.

In 2021, I filed a declaration in a SAD Scheme case in support of a defendant's motion for attorneys' fees. Declaration of Dean Eric Goldman, Emoji Co. GmbH v. the Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations Identified on Schedule A Hereto, No. 21-cv-1739 (N.D. Ill. filed Aug. 1, 2021), https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=3534&context=historical [hereinafter Emojico Declaration].

Electronic copy available at: https://ssrn.com/abstract=4381824

TABLE OF CONTENTS

Introduction ................................................................................................ 2
I. How the SAD Scheme Works ............................................................... 4
    A. The SAD Scheme in Eight Steps ............................................... 4
    B. A SAD Case Study ...................................................................... 11
II. Quantifying the SAD Scheme's Prevalence .................................... 13
III. How the Legal System Fails to Curb the SAD Scheme ............... 15
IV. Ways to Address the SAD Scheme .................................................. 20
    A. Judicial Education ....................................................................... 20
    B. Changes in Online Marketplace Policies ................................. 21
    C. Greater Use of Existing Legal Doctrines ................................. 21
    D. Possible Statutory Reforms ....................................................... 24
Conclusion ................................................................................................ 24

INTRODUCTION

This paper identifies an underreported system of abusive intellectual property ("IP") litigation.[1] Indeed, the system is so obscure that it doesn't have an official name yet. This paper calls it the "Schedule A Defendants" scheme (the "SAD Scheme") because the suing rightsowners often enumerate the defendants in a Schedule A[2] filed separately from the complaint,[3] followed by a request to seal the Schedule A.

---

[1] Prior work on mass-defendant intellectual property enforcement includes: Shyamkrishna Balganesh, *The Uneasy Case Against Copyright Trolls*, 86 S. CAL. L. REV. 723 (2013); Shyamkrishna Balganesh & Jonah B. Gelbach, *Debunking the Myth of the Copyright Troll Apocalypse*, 101 IOWA L. REV. ONLINE 43 (2016); Colleen V. Chien, *Of Trolls, Davids, Goliaths, and Kings: Narratives and Evidence in the Litigation of High-Tech Patents*, 87 N.C. L. REV. 1571 (2009); Brad A. Greenberg, *Copyright Trolls and Presumptively Fair Uses*, 85 U. COLO. L. REV. 53 (2014); Brad A. Greenberg, *Copyright Trolls and the Common Law*, 100 IOWA L. REV. BULL. 77 (2015); Michael S. Mireles, *Trademark Trolls: A Problem in the United States?*, 18 CHAP. L. REV. 815 (2015); Matthew Sag, *Copyright Trolling, An Empirical Study*, 100 IOWA L. REV. 1105 (2015) (discussing Multi-Defendant John Doe ("MDJD") lawsuits); Matthew Sag & Jake Haskell, *Defense Against the Dark Arts of Copyright Trolling*, 103 IOWA L. REV. 571 (2018).

[2] "Schedule A" appears to be the most commonly used descriptor of the separate list of defendants, but plaintiffs have also used "Exhibit 1," "Exhibit A," "Annex A," and other synonyms. *See* Part III.

[3] There are many variations, but a typical SAD Scheme complaint caption might refer to the defendants as "the Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations Identified on Schedule A Hereto."

Electronic copy available at: https://ssrn.com/abstract=4381824

Rightsowners use the SAD Scheme against allegedly infringing[4] items being sold via online marketplaces like Amazon and Wish, typically by international marketplace merchants.[5] Most SAD Scheme cases are trademark lawsuits in the Northern District of Illinois. The SAD Scheme likely has targeted hundreds of thousands of defendants and deprived the federal government of a quarter-billion dollars of court filing fees.

The SAD Scheme targets a recurring problem for rightsowners: how to cost-effectively redress high volumes of infringement in online marketplaces, especially when the alleged infringers are not located in the U.S. and hide their identities and locations.[6] Unfortunately, the SAD Scheme "solves" this problem by subverting existing intellectual property and civil procedure rules. Each step in the scheme nominally follows the rules, but the unique combination of steps nevertheless leads to outcomes that do not comport with due process and the rule of law. By enabling rightsowners to weaponize the legal system, the SAD Scheme goes well beyond its legitimate roots of policing online infringement and causes harm to marketplace operators, innocent vendors, and marketplace consumers. Although eliminating the SAD Scheme will undoubtedly make it harder for rightsowners to do their enforcement work, the rule of law requires it.

Part I of the paper describes how the SAD Scheme works. Part II quantifies its prevalence. Part III describes how the SAD Scheme abuses the legal system. Part IV discusses some ways to curb the SAD Scheme.

---

[4] Rightsowners may be overclaiming infringement, and those claims may never get tested in court. In particular, a SAD rightsowner-plaintiff may characterize the defendants' items as "counterfeits," even when the items are knockoff goods (which may or may not be infringing), grey market goods, goods that have leaked out of the rightsowner's official distribution channels, used or refurbished goods, or otherwise non-infringing. Thus, rightsowners' "counterfeit" claims may not be accurate. *See generally* Sarah Burstein, *Guest Post: Against the Design-Seizure Bill*, PATENTLY-O (Jan. 3, 2020), https://patentlyo.com/patent/2020/01/against-design-seizure.html (discussing how "counterfeit" allegations may be rhetorically deceptive).

[5] Samuel Baird & Noel Paterson, *How Some Brands are Successfully–and Cost-Effectively–Combating Online Counterfeiters*, IPWATCHDOG (Oct. 13, 2022), https://ipwatchdog.com/2022/10/13/brands-successfully-cost-effectively-combating-online-counterfeiters/id=152088/.

[6] Rightsowners will find it easier to locate and sue online marketplace vendors due to laws like the Arkansas Online Marketplace Consumer Inform Act (4-119-101 to -105), which requires some merchants to publicly display a physical address, and the similar INFORM Act passed by Congress in 2022.

Electronic copy available at: https://ssrn.com/abstract=4381824

I. How the SAD Scheme Works

This part describes how the SAD Scheme works and provides a case study of an abusive SAD Scheme lawsuit.

A. The SAD Scheme in Eight Steps

A typical Schedule A Defendant lawsuit follows this eight-step protocol:

*Step 1*: File a complaint with a caption referencing defendants listed on a Schedule A, as indicated by the red arrow below:[7]



The complaint will contain sparse factual assertions, none particularized to any defendant. The complaint's generic prose makes it easy to clone-and-revise for subsequent cases.

---

[7] Emoji Co. GmbH v. the Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations Identified on Schedule A Hereto, No. 21-cv-1739 (N.D. Ill. complaint filed Mar. 31, 2021).

Electronic copy available at: https://ssrn.com/abstract=4381824

*Step 2*: File the Schedule A defendant list separately from the complaint (it will have a different docket entry number) and ask the judge to seal it. An example docket:[8]

| | | | |
|---|---|---|---|
| ☐ 1 | Aug. 07, 2020 | **View** | COMPLAINT filed by John Doe; Jury Demand. Filing fee $ 400, receipt number 0752-17293091.(Hierl, Michael) (Entered: 08/07/2020) |
| ☐ 2 | Aug. 07, 2020 | **Request** | SEALED DOCUMENT by Plaintiff John Doe Exhibit 1 (Hierl, Michael) (Entered: 08/07/2020) |
| ☐ 3 | Aug. 07, 2020 | **Request** | CIVIL Cover Sheet (Hierl, Michael) (Entered: 08/07/2020) |
| ☐ 4 | Aug. 07, 2020 | **Request** | ATTORNEY Appearance for Plaintiff John Doe by Michael A. Hierl (Hierl, Michael) (Entered: 08/07/2020) |
| ☐ 5 | Aug. 07, 2020 | **Request** | ATTORNEY Appearance for Plaintiff John Doe by William Benjamin Kalbac (Kalbac, William) (Entered: 08/07/2020) |
| ☐ 6 | Aug. 07, 2020 | **Request** | MOTION by Plaintiff John Doe to seal document Plaintiff's Motion for Leave to File Under Seal (Hierl, Michael) (Entered: 08/07/2020) |
| ☐ 7 | Aug. 07, 2020 | **Request** | SEALED DOCUMENT by Plaintiff John Doe Sealed Schedule A (Hierl, Michael) (Entered: 08/07/2020) |

---

[8] This screenshot was taken in Bloomberg Law. Note that this rightsowner hid its identity. *See infra* note 10.

Electronic copy available at: https://ssrn.com/abstract=4381824

The actual contents of Schedule A may be threadbare, such as this example:[9]

| Schedule A | | Schedule A | |
|---|---|---|---|
| No. | Defendant Name / Alias | | |
| 1 | dourty | 41 | gold master DIY lab |
| 2 | LuYiShiHaiChuangMuDiePinChang | 42 | Cocoaparts |
| 3 | 365861170 | 43 | CenterPort |
| 4 | 1 Milion | 44 | CRAFTREALAXY |
| 5 | _4_phn3k | 45 | Crown Matauri |
| 6 | ACTOP | 46 | Crystalk |
| 7 | autotatou | 47 | CS—OBJ |
| 8 | AIHUYOO | 48 | Customion Store |
| 9 | AILSL2A-US | 49 | Dahuigwosh |
| 10 | AIHO | 50 | dairemow |
| 11 | Alexander Hamilton | 51 | daireotias |
| 12 | Altaily | 52 | daibinga |
| 13 | AllOverAgain | 53 | Danny Tran |
| 14 | alimertios | 54 | datirnomhernotanglhantwangduo |
| 15 | Amaze Overseas | 55 | DaTongShiLinYiKaiYouXianGongSi |
| 16 | ArshRug | 56 | Dawei Trading |
| 17 | Arrenlaa | 57 | DayouaTraehable EpackecC5 (Main arrives) |
| 18 | Artfero | 58 | DeadeMin |
| 19 | Ayanatly DIT | 59 | Deng Chen |
| 20 | Aoka | 60 | DengBaji |
| 21 | bengjingduifwe | 61 | Design With Wood |
| 22 | BAOLIAOLZ | 62 | DIYHOT |
| 23 | Bear Orange Club | 63 | DO-TSUTEGCLY |
| 24 | Best Cool Gift | 64 | Denbak |
| 25 | BestLife Store | 65 | DengDengMeiDiem |
| 26 | Biya | 66 | dengdongtiazhiao |
| 27 | Bitasna | 67 | dingwaiyanbuginbi |
| 28 | CafePour | 68 | Doubin Gift |
| 29 | catzly | 69 | danfazhongsihai |
| 30 | CAO THI MY shop | 70 | Edea Edea |
| 31 | CATEDER | 71 | Emily Boylebbii |
| 32 | CHangSHM | 72 | F6-OCEAN |
| 33 | changxiaqigu fengpiao Sintegsbi xtamaofan | 73 | fan jin shao ti |
| 34 | dongxingqiuhegudoulooctipdfnafingdingduohansiad | 74 | fanheli |
| 35 | Chines4 | 75 | FarmsMug US |
| 36 | Cheese & Chill | 76 | FeiDianGoutTingDianCaiChang |
| 37 | Christian's house | 77 | fidecliomt |
| 38 | Cifacatetelies | 78 | fingard |
| 39 | Clarku4WH | 79 | filine Sidanto |
| 40 | shuoldilenee | 80 | fitisting Jomtl |
| | | 81 | FINOLL |

| Schedule A | | Schedule A | |
|---|---|---|---|
| 82 | GRAFY | 123 | JiHouXiaoJueXianHaiHaoDian |
| 83 | Great Faire | 124 | JC Home Online |
| 84 | Greaf | 125 | JORUMO |
| 85 | gdtyty) | 126 | Jolly Factory |
| 86 | GTN Tech | 127 | Jowap cookware |
| 87 | gangshoutsingmen | 128 | Justin HoodVan |
| 88 | ChangZhonDeMinTianfBangMuYiunXianGongSi | 129 | KaiFengDhoOuBingMuYim |
| 89 | guangfuhornbzingmiuriymutangzegei | 130 | KAPOKKU |
| 90 | guijdhacoton 8HOP | 131 | KATIEN |
| 91 | HAMOJIB | 132 | Kelly biofl |
| 92 | hanki | 133 | KEVIN MANES |
| 93 | harchidahangfnenkacthi | 134 | KiloD6L |
| 94 | HAOYUBOTONS-US | 135 | Knba |
| 95 | Harteon Mug store | 136 | LBC HOME |
| 96 | Hyele | 137 | LanKhou |
| 97 | HeBeiDaWeiXinCaiJiacYouXianGongSi | 138 | LEILAMY fashion |
| 98 | hemeiubbingchuangdigongfongyuniangangi | 139 | LEKSHAN |
| 99 | hennimaingngywwfhnwyuimdlchyautingngi | 140 | Leston |
| 100 | HLPukrentrauch | 141 | Letke mail |
| 101 | Hocriie | 142 | Libelioa US |
| 102 | Home Ld | 143 | LiMEUP |
| 103 | HouViCapVinDoWuYimXianGongSi | 144 | limase US |
| 104 | HQXMD | 145 | livitong |
| 105 | HRUNC8 | 146 | lolandi |
| 106 | Hu-3-Long | 147 | Loaress |
| 107 | iacrouds | 148 | LUCKY MEAT |
| 108 | IDEROD740 | 149 | ludywaheet |
| 109 | Ilgin Choa Store | 150 | Lumonn |
| 110 | IMILO Shoaings | 151 | LuheZhangUS |
| 111 | ILSKYPYTFY | 152 | luchuinghia |
| 112 | iorja | 153 | LUOO3 TRUMI |
| 113 | J Ann Fashion | 154 | LUZHILO |
| 114 | Jaum Pagar | 155 | LvMinDaMeiaHanYiYouXianGongSi |
| 115 | jaylahexan | 156 | LvTianQnAicDaShanXingYongPinJingXianChu |
| 116 | JIANELDA | 157 | MAGDLIK |
| 117 | JLAJ2—Q2 | 158 | majdti |
| 118 | jiangwei1975 2021 | 159 | Matching Stuff |
| 119 | jiadromzng | 160 | May Gift Department Store |
| 120 | jiadla DS | 161 | maigihihg |
| 121 | Juan 1 iita District Meijin E-commerca | 162 | Maomae |
| 122 | jindongjindiengtoru | 163 | mdangmee |

| Schedule A | | Schedule A | |
|---|---|---|---|
| 164 | Ming store | 205 | YuGYingqiUGoDian |
| 165 | mingcangwangduo | 206 | machacom |
| 166 | mueecarbats | 207 | mueimegangxuo |
| 167 | miumiuhoruju | 208 | Yeiton Trading |
| 168 | Muddly Fole | 209 | Yidian |
| 169 | MISSSSU | 210 | yiniahdiengnuevinningmgei |
| 170 | MY12 | 211 | YUNIVI4chip |
| 171 | MYopu | 212 | YSTVD |
| 172 | Minoey Jet | 213 | YYHLJ |
| 173 | MunoTech | 214 | Z-C-L |
| 174 | My Smart Choice | 215 | zd16530 |

Instead of using a sealed defendant list, rightsowners could file the entire complaint under seal.[10] This example lists nearly 100 defendants in the caption:[11]



---

[9] Emoji Company GmbH v. The Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations Identified on Schedule A Hereto, 1:21-cv-01739 (N.D. Ill. complaint filed Mar. 31, 2021).

[10] In another variation, a rightsowner sued as a "Doe" plaintiff and sealed the identity of the allegedly infringed IP. Doe v. The Partnerships and Unincorporated Associations Identified on Schedule "A," No. 22-cv-5512 (N.D. Ill. complaint filed Oct. 7, 2022). The rightsowner explained: "Plaintiff's name is being temporarily withheld to prevent Defendants from obtaining advance notice of this action and Plaintiff's accompanying ex parte Motion for Entry of Temporary Restraining Order and transferring funds out of the accounts that Plaintiff seeks to retrain. Plaintiff is identified on the U.S. Certificate of Trademark Registration for Plaintiff's trademark filed under seal as Exhibit 1." *Id.* FN1. That lawsuit targeted over 475 defendants. *See id.* Default Final Judgment Order filed Dec. 14, 2022.

[11] Moonbug Entertainment Ltd. v. 640350 Store, No. 1-22-cv-05042-AT (S.D.N.Y. complaint filed July 12, 2022).

Electronic copy available at: https://ssrn.com/abstract=4381824

This paper's analysis applies to any case where a rightsowner initially seals the defendants' identities.

Rightsowners may have legitimate reasons to seal defendant identities, such as to prevent defendants from dissipating assets or destroying evidence before the rightsowner can effectuate service. Because the practice isn't always illegitimate, judges have the discretion to reject the rightsowner's sealing request.[12] Such requests deserve careful scrutiny to confirm their legitimacy. Nevertheless, judges may instead acquiesce to the rightsowners' generic purported justifications. So long as a Schedule A remains sealed, defendants will publicly self-identify only when they formally appear in the case. Defendant identity sealing should only last through the case's initial stages, but judges may not revisit the sealing if no one is complaining about it.

*Step 3*: The rightsowner requests an ex parte TRO against the defendants' allegedly infringing behavior.[13] Because it's ex parte, defendants cannot highlight any problems with the rightsowner's case, though judges may spot defects *sua sponte*.[14] Equitable relief is common in intellectual property cases,[15] so an ex parte TRO request does not seem unusual.

*Step 4*: After the judge grants an ex parte TRO, the rightsowner submits it to the online marketplaces where the defendants are selling.

*Step 5*: The online marketplaces typically honor the TRO, whether they are legally required to do so or not,[16] to reduce the risk of a contempt proceeding. Plus, the TRO might qualify as notice to the online marketplace of infringing activity, which

---

[12] FRCP 5.2(d).

[13] Baird & Paterson, *supra* note 5 (noting that emergency TROs "increased 70% from 2019 to 2021," largely due to the SAD Scheme).

[14] *E.g.*, Zuru (Singapore) Pte, Ltd. v. Individuals, Corporations, Limited Liability Companies, Partnerships, & Unincorporated Associations Identified on Schedule A, No. 20-00395 JMS-KJM (D. Haw. Jan. 29, 2021) (denying the rightsowner's ex parte TRO request because "the cookie-cutter statements contained in each declaration suggest that Plaintiffs did not expend much effort in this case to establish any *particularized* facts that would warrant ex parte relief").

[15] *E.g.*, eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006) (Justice Roberts, concurring) ("From at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases").

[16] Even if the TRO directs online marketplaces to take action, they are not a named party in the pending case and may not be otherwise acting "in active concert or participation" with the defendants. FRCP 65(d)(2).

Electronic copy available at: https://ssrn.com/abstract=4381824

increases their risk of contributory infringement in future cases if they don't take action.[17]

To implement the TRO, online marketplaces often will freeze all of the defendants' marketplace activity, not just any infringing activity. This freeze immediately harms defendants in two ways.

First, the freeze locks any cash being held by the online marketplace.[18] This freeze can create severe or even fatal cash flow problems for the defendant, because it may not be able to pay its vendors, employees, or lawyers.

Second, the freeze cuts off future sales by the vendor—including both allegedly infringing items *and any other non-infringing items*.[19] Thus, there is a crucial mismatch between the TRO's intended and actual remedies. The TRO should only reach items within the scope of the rightsowner's IP, but the TRO-induced freeze can restrict unrelated items and reduce the vendor's legitimate profits.

Worse, excluding legitimate competitors from the marketplace means that consumers have fewer choices and pay higher prices due to this collateral effect. In this way, the ex parte TRO hurts the public interest.

*Step 6*: Because its identity in the complaint is still sealed, the defendant may first learn about the lawsuit when its marketplace account is frozen.[20] With the defendant's business and cash flow in tatters, the SAD Scheme rightsowner can offer a convenient settlement—if the defendant pays an amount inflated by the defendants' desperation for immediate resolution.[21] If the defendant accepts the settlement, the rightsowner dismisses the defendant from the case.

---

[17] *E.g.*, Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93 (2d Cir. 2010).

[18] Judge Pacold's SAD Scheme TRO template form (discussed below) instructs online marketplaces to "restrain and enjoin any such accounts or funds from transferring or disposing of any money or other of Defendants' assets until further order by this Court." https://www.ilnd.uscourts.gov/_assets/_documents/_forms/_judges/Pacold/TRO%20Template%20 Schedule%20A%20cases.pdf.

[19] *See* Gorge Design Group LLC v. Xuansheng, 21-1695 (Fed. Cir. opening brief filed Oct. 25, 2021).

[20] *See* ABC Corp. I v. The Partnership and Unincorporated Associations Identified on Schedule "A", 21-2150 (Fed. Cir. Oct. 28, 2022) (an Amazon account freeze didn't give notice of the lawsuit sufficient to compel a defendant to engage with the suit).

[21] *See* Gorge Design Group LLC v. Xuansheng, 21-1695 (Fed. Cir. opening brief filed Oct. 25, 2021):

> [the rightsowner] subjected NeoMagic to a short barrage of sealed litigation intended to secretly shut down NeoMagic's business, seize NeoMagic's marketplace (typically listing more than 100,000 products daily), and freeze

Electronic copy available at: https://ssrn.com/abstract=4381824

Ordinarily, settlements of intellectual property disputes are viewed as positive developments, because in theory the parties reached a mutually beneficial outcome while preserving judicial resources.[22] In practice, SAD Scheme settlements indicate a defect in our adversarial model of jurisprudence. That model assumes that the truth prevails when litigants both tell their best version of their story before an independent adjudicator. In the SAD Scheme's case, the TRO was issued based only on the rightsowner's best story, without hearing from the defendants at all. Defendants then prefer the speed, cost, and predictability of the rightsowner's settlement offer over adversarial combat in court—even if the defendants could win in court if they told their best story. This means the defendants never tell their story at all in court, making settlements produced by ex parte proceedings the antithesis of our adversarial model of justice. The proliferation of such settlements should act as cautionary signals of a process failure, not confirmation of its proper functioning.

*Step 7*: The rightsowner may choose to drop any defendant who doesn't acquiesce to the settlement. By strategically deciding who remains in the case, the rightsowner can control what adversarial information reaches the judge.[23] With a steady stream of dismissed defendants (who settled or are dismissed voluntarily), the case superficially appears to be moving forward.

*Step 8*: After the settlements and voluntary dismissals, the remaining defendants will not appear in court for a variety of reasons: they can't afford to litigate; the amount of money at stake isn't worth the litigation costs; the defendant never got proper notice/service; the defendant is outside the U.S. and thinks it is not bound by any U.S. court proceeding; the defendant is bankrupt, perhaps due to the marketplace freeze; or the defendant infringed and knows it would lose in court.

---

NeoMagic's funds (in excess of $300,000) based upon the sale of a single unit of a $4.99 product… Gorge still demanded payment of $9,500 for Gorge to release the over $300,000 of NeoMagic money that remained frozen (crippling NeoMagic's ability to do business).

[22] *E.g.*, 1-800-Contacts, Inc. v. Fed. Trade Comm'n, 1 F.4th 102 (2d Cir. 2021).

[23] Gorge Design Group LLC v. Xuansheng, 21-1695 (Fed. Cir. opening brief filed Oct. 25, 2021) ("Gorge dismissed NeoMagic under Rule 41 immediately preceding the injunction hearing so that NeoMagic could not present [adverse] information verbally to the district court").

Electronic copy available at: https://ssrn.com/abstract=4381824

The rightsowner then seeks default judgments against the no-show defendants, which courts are inclined to grant,[24] though they may trim the damages amount or scope of the injunction. Rightsowners realistically may not expect to collect any money directly from defendants after the default judgments, but courts may order online marketplaces to turn over any frozen cash to satisfy the judgment.[25]

B. A SAD Case Study[26]

Emojico is a German company with US trademark registrations in the word "emoji" for numerous classes.[27] Aided by this ownership claim over a common dictionary term, Emojico licenses vendors to sell goods under an "emoji" brand.

In one of its Schedule A Defendants cases, Emojico claimed this Amazon marketplace listing infringed:

---

[24] A common judicial attitude towards defaulting defendants: "If defendants in any Schedule A case seek to present constitutional or historical challenges to a plaintiff's legal theories, those defendants—as parties to the case—should appear and make those arguments in the first instance." Oakley, Inc. v. the Partnerships and Unincorporated Associations Identified on Schedule "A", 1:22-cv-01570 (N.D. Ill. Oct. 24, 2022).

[25] *E.g.*, Ontel Products Corp. v. The Unincorporated Associations Identified in Schedule A, 1:21-cv-01452-MSN-JFA (E.D. Va. Aug. 12, 2022).

[26] For a design patent case study, *see* Sarah Burstein, *Guest Post: We Need to Talk About the NDIL's Schedule-A Cases*, PATENTLY-O (Oct. 30, 2022), http://patentlyo.com/patent/2022/10/guest-post-about.html (discussing ABC Corp. I v. The Partnership and Unincorporated Associations Identified on Schedule "A", 22-1071 (Fed. Cir. Oct. 28, 2022)).

[27] *E.g.*, EMOJI, Reg. #5489322 (2018) (covering goods such as motor buses, hub caps, caps for vehicle petrol, ships' hulls, and rowlocks); EMOJI, Reg. # 5415510 (2018) (covering goods such as penis enlargers, cuticle pushers, fruit knives, pesticides, and bowel evacuant preparations).

Electronic copy available at: https://ssrn.com/abstract=4381824



Emojico apparently conducted a keyword search in Amazon's marketplace for the word "emoji" and flagged hundreds of listings where the word "emoji" appeared in the product title or description. Emojico then claimed that all of the listings violated its trademark rights in the word "emoji." In the screenshot above, the green box indicates the alleged infringement.

This is not a serious trademark claim. Trademark law typically restricts using a trademarked term as a source identifier. The depicted mug isn't using "emoji" as a source identifier. It's not an "emoji"-branded mug. The word "emoji" doesn't appear on the mug. The only reference to "emoji" is the description of the poop emoji.

Furthermore, trademark law recognizes "descriptive fair use,"[28] which occurs when a dictionary word describes a product's attributes. That's exactly what the Amazon merchant is doing—telling consumers that the mug displays a poop emoji. The merchant has no other way to accurately describe the mug. Any synonym for "poop emoji" would hinder consumer decision-making, and trademark law does not require vendors to linguistically stretch so much.

---

[28] 15 U.S.C. § 1115(b)(4).

Given its obvious deficiencies, this trademark claim never should have been brought. Yet, pursuant to the SAD Scheme, a judge may never hear any objection to Emojico's enforcement. By overclaiming its trademark registration in "emoji" and then controlling the narrative told to the judge, Emojico can weaponize the legal system to obtain legally unsupportable settlements or default judgments over poop emoji mugs.

## II. QUANTIFYING THE SAD SCHEME'S PREVALENCE

This part provides empirical details about the SAD Scheme.

*Methodology*

On December 28, 2022, I entered the following search query into Bloomberg Law Docket's "parties" field:

> "schedule a" or "exhibit 1" or "exhibit a" or "annex a" or "annex 1" or "schedule 1"

This produced a total dataset of 9,181 cases. Using Bloomberg Law's search filters, I then made the following configurations:

- I excluded state and foreign cases.[29]
- I selected cases using the Federal NOS fields of copyright, patent, or trademark.[30] This excluded a long list of other claims, of which the most common were forfeiture cases.
- I limited the dataset to cases where the search terms appeared in the "complaint."

These parameters generated a dataset of 3,217 cases dating back to 1991. The first dataset case styled with a "Schedule A" caption was in 2013.[31]

---

[29] Federal copyright and patent claims must be filed in federal court. 28 U.S.C. § 1338. Federal trademark claims can be filed in state court (*id.*), but that's rarely done. Excluding state court cases from the dataset may undercount any SAD Scheme cases involving exclusively state IP claims or federal trademark cases filed in state court, but it's extremely unlikely that there are many of those cases.

[30] The NOS field is notoriously error-prone. Among other structural problems, a case must fit within a single type of claim, even if it raises multiple types. For example, if a complaint included utility patent, trademark, and copyright claims, it would be categorized in only one of those fields.

[31] Deckers Outdoor Corp. v. The Partnerships and Unincorporated Associations Identified on Schedule "A" and Does 1-100, No. 1:13-cv-00043 (N.D. Ill. complaint filed Jan. 3, 2013). This lawsuit involved 1,368 domain names. *Id.* docket entry #27.

Electronic copy available at: https://ssrn.com/abstract=4381824

Of the 3,217 dataset cases, 2,846 cases (over 88%) were filed in the Northern District of Illinois. The Southern District of Florida had 242 cases (7.5%). The remaining jurisdictions were all under 2%.

Why is the SAD Scheme concentrated in the Northern District of Illinois? I'm still not sure, but I can speculate. The most obvious hypotheses are that (1) the system succeeds in the district, though that doesn't answer the more critical question of "why?," and (2) local practitioners have a successful track record using the system and use that to generate business from rightsowners. Two commentators speculated that it's "because of the large consumer base in the area" and the federal courts are "friendly to cases using anonymous plaintiffs and case combining."[32] As evidence to support the latter point, Judge Pacold provides rightsowners with templates to make SAD Scheme filings[33]—i.e., she literally helps SAD Scheme rightsowners win in her courtroom. However, the SAD Scheme cases are spread across all of the district's judges, so Judge Pacold's interventions don't alone explain the concentration.

Of the 3,217 dataset cases, 2,837 cases (88%) list "trademarks" in the NOS field.[34] Copyright and patent cases are about 6% each.

Of the 3,217 cases in the dataset, 935 were filed in 2022, 733 were filed in 2021, and 533 were filed in 2020. Collectively, the data indicate that the cases are growing exponentially on a year-to-year basis, and over 2/3 of the all-time SAD Scheme lawsuits were filed in the last 3 full calendar years.

Bloomberg Law also allows for searches by how the case resolved.[35] Given the SAD Scheme's relatively recent emergence, many cases may not have reached

---

An earlier example is Yahoo! Inc. v. yahooahtos.com, No. 1:05-cv-01441 (E.D. Va. complaint filed Dec. 12, 2005), which involved "1865 other domain names listed on Exhibit A."

[32] Baird & Paterson, *supra* note 5; *see also* Lauraann Wood, *Northern Ill. A Surprise Magnet For Counterfeiting Suits*, LAW360 (Jan. 24, 2023), https://www.law360.com/ip/articles/1568802.

Local rules might contribute to actual or perceived differences among districts. For example, the Northern District of Illinois has local rules regarding sealed filings. Local Rules of the United States District Court Northern District of Illinois, LR 5.7, 5.8, & 26.2 (Sept. 1, 1999, amended Mar. 29, 2021), https://www.ilnd.uscourts.gov/_assets/_documents/_rules/LRRULES.pdf. However, the details of the local sealing rules don't seem likely to encourage more sealing than in other districts.

[33] https://www.ilnd.uscourts.gov/judge-cmp-detail.aspx?cmpid=1272.

[34] For additional analyses of SAD Scheme case data by industry, see Baird & Paterson, *supra* note 5.

[35] To get this option, I had to unselect the restriction to "complaints," which increased the dataset slightly to 3,241 instead of 3,217.

Electronic copy available at: https://ssrn.com/abstract=4381824

a resolution yet. Furthermore, it's unclear how Bloomberg Law categorizes the resolution of a "case" that has hundreds of defendants who may have reached different dispositions. Despite those data problems, the data support some inferences. Of the cases that listed a resolution (2,688 cases), 70% were categorized as "default judgments," 28% were categorized as "voluntary/joint dismissal," and less than 2% of the resolutions had some other conclusion (like an adjudication on the merits).

When I reviewed the Emojico SAD Scheme cases in 2021, I estimated that Emojico sued an average of over 200 defendants in each case.[36] It's not easy to confirm the average defendants-per-complaint sued by other rightsowners, though based on my anecdotal review, Emojico does not appear to be an outlier. If the 200 defendants-per-complaint average is constant across the dataset, then over 600,000 defendants have been sued in a SAD Scheme case. Even a lower average of 80 defendants-per-complaint would indicate over a quarter-million affected defendants.

### III. How the Legal System Enables the SAD Scheme

The SAD Scheme works in part by taking advantage of several dynamics. First, intellectual property claims routinely impose strict liability, which makes it easier for rightsowners to succeed with minimal factual showings. Further, because of the "property" connotations of "intellectual property," judges may overlook procedural defects to help vindicate the property interests. Second, the SAD Scheme can take place largely or wholly ex parte, so judges act on the rightsowners' unrebutted assertions. Third, the online marketplaces' over-response to the TRO plays a critical role. Collectively, these dynamics allow rightsowners to nominally follow the rules and yet achieve abusive and extortive outcomes. This part explains how those forces contribute to the SAD Scheme's success.

*Robo-Pleading*. Profitable mass IP enforcement generally relies on low-cost litigation operations, and rightsowners recycle materials as much as possible. For example, SAD Scheme rightsowners reuse complaint templates by asserting generic facts, none particularized to any defendant. Robo-pleading may not comport with the FRCP's pleading standards and pre-filing investigatory work.[37]

---

[36] Emojico Declaration, *supra* note *.

[37] FRCP 11.

Electronic copy available at: https://ssrn.com/abstract=4381824

However, in ex parte proceedings, judges have to unilaterally call out deficiencies, and sometimes judges are willing to overlook threadbare allegations.

*Bypassing Service*. Rightsowners may have difficulty serving defendants, especially if they are located internationally.[38] To sidestep this issue entirely, the rightsowner can adjudicate its rights ex parte without making service.[39] Using marketplace freezes and the resulting settlements, rightsowners could in theory completely resolve the lawsuit without ever serving any defendant.

*Bypassing Personal Jurisdiction*. A robo-complaint typically will generically allege that all defendants committed infringing acts in the rightsowner's home court. Such generic allegations may not comport with jurisdictional requirements. For example, due process typically requires that each online defendant intentionally direct their actions into the forum jurisdiction,[40] and that "intent" standard requires defendant-specific facts. Furthermore, the complaint usually won't provide any information about the defendants' locations[41] or provide any other defendant-specific facts supporting personal jurisdiction. Thus, judges have to affirmatively demand more details from the rightsowner to confirm that it has personal jurisdiction over all of the defendants. If the judges uncritically accept generic jurisdiction allegations, they are likely permitting the case to proceed against some defendants who aren't properly subject to personal jurisdiction.

*Misjoinder*. In general, courts interpret joinder rules liberally, and expansive joinder provisions can offer significant efficiencies to rightsowners.[42] At the same time, misjoinder can severely disadvantage defendants and cause chaos in the court system.

Typically, in a SAD Scheme case, the defendants have no relationship with each other. Instead, the rightsowner sweeps up an assemblage of alleged infringers in an online marketplace and enumerates them in a complaint. The rightsowner then generically asserts that the defendants are related to each other without providing any factual support.

---

[38] FRCP 4(f).

[39] FRCP 65(b)(1)(B) requires that the "movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required" before an ex parte TRO is issued. However, it doesn't require notice to be given, even if the attorney could easily do so.

[40] *E.g.*, ALS Scan v. Digital Service Consultants, Inc., 293 F.3d 707 (4th Cir. 2002).

[41] Recall the threadbare list of defendants in Part I, "Step Two."

[42] *E.g.*, David O. Taylor, *Patent Misjoinder*, 88 N.Y.U. L. Rev. 652, 671-72 (2013).

Electronic copy available at: https://ssrn.com/abstract=4381824

The FRCP permits joinder of defendants only "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences."[43] Defendants who are independently (allegedly) infringing the rightsowner's IP rights in parallel with each other in the same marketplace do not satisfy this standard. One court explained:

> The allegations and evidence plaintiff has provided only supports a conclusion that many distinct counterfeiters are using similar strategies to sell counterfeit versions of plaintiff s HUGGLE products, and they may be acquiring these counterfeit products from the same or similar sources. Distinct individuals or entities independently selling counterfeit goods over the internet does not satisfy the transaction or occurrence requirement of FRCP 20.[44]

Nevertheless, showing the characteristic judicial deference to the SAD Scheme, the judge disregarded the joinder defect.[45]

Misjoinder substantially improves the economics of SAD Scheme litigation.[46] The complaint filing fee is $402, regardless of how many defendants are named.[47] By combining unrelated defendants into a single case, the rightsowner can cut its per-defendant filing costs. For example, if the rightsowner names 200 defendants on a Schedule A, the filing costs drop 95% to about $2 per defendant instead of $402 per defendant. That $400 difference makes more enforcement actions financially viable.

The rightsowners' windfall comes at the government's expense. When 200 defendants are improperly joined in a single complaint, the government loses

---

[43] FRCP 20(a)(1)(A). In patent cases, joinder requires that the claims (1) are asserted "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, importing into the United States, offering for sale, or selling of the same accused product or process," and (2) "questions of fact common to all defendants or counterclaim defendants will arise in the action." 35 U.S.C. § 299.

[44] Ontel Products Corp. v. The Unincorporated Associations Identified In Schedule A, 1:21-cv-01452-MSN-JFA (E.D. Va. Aug. 12, 2022).

[45] *Id.* ("any defects related to joinder in this action would not affect any of the remaining defendants' substantial rights").

[46] Emoji Declaration, *supra* note *, ¶21. IP trolling routinely involves expansive approaches to joinder. *See* Sag & Haskell, *supra* note 1, at 584-88.

[47] This includes the $350 filing fee for civil actions per 28 U.S.C. § 1926(a) and a $52 administration fee per 28 U.S.C. § 1915.

Electronic copy available at: https://ssrn.com/abstract=4381824

$80,000 in filing fees. If that average holds true over the 3,200+ SAD Scheme cases, the SAD Scheme has cost the government over $250 million to date.[48]

*Oversealing Defendant Identities*. The court system generally requires the litigants to identify themselves as part of ensuring proper transparency of the judicial system.[49] Although sealed defendant identities are occasionally appropriate, judges should scrutinize such requests carefully. Defendants could explain why the secrecy is improper if they could appear at the ex parte TRO hearing, but they are excluded by definition. That puts the burden on the judge to anticipate all of the problems with the sealing request. However, judges are instead inclined to accept the rightsowner's advocacy at face value.[50]

*Dismissal of Defendants Who Fight Back*. As discussed above, rightsowners can strategically use defendant dismissals to curate the adversarial information presented to judges. Thus, high volumes of voluntary dismissals should be treated not as good news but instead as indicators of possible litigation pathologies.

*Non-Individualized Adjudication*. It's usually not cost-effective for rightsowners to engage in individualized litigation against each SAD Scheme defendant. Ex parte hearings are a low-cost alternative—essentially they provide non-individualized adjudication for all defendants, because defendants aren't around to make their individual cases.

*Extra-Judicial Resolutions*. The ex parte TRO is the linchpin to the SAD Scheme. To get it, rightsowners must show "specific facts…that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."[51] Judges should enforce the "specific facts" requirement

---

[48] Of course, rightsowners would drop some defendants if they had to pay the full filing fee per defendant, which reinforces the filing fee's important gatekeeping function. *See generally 2011-2012 Policy Paper: Courts Are Not Revenue Centers*, CONFERENCE OF STATE COURT ADMINISTRATORS, https://cosca.ncsc.org/__data/assets/pdf_file/0019/23446/courtsarenotrevenuecenters-final.pdf (Principle 1 says "Court users derive a private benefit from the courts and may be charged reasonable fees partially to offset the cost of the courts borne by the public-at-large").

[49] *E.g.*, Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 HASTINGS L.J. 1353 (2022); Lior Strahilevitz, *Pseudonymous Litigation*, 77 U. CHI. L. REV. 1239 (2010); *White Paper: Anonymous Civil Litigants*, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, https://www.rcfp.org/journals/news-media-and-law-fall-2015/white-paper-anonymous-civil-l. *See generally* Bernard Chao, *Not So Confidential: A Call for Restraint in Sealing Court Records*, 2011 PATENTLY-O PATENT L.J. 6, https://cdn.patentlyo.com/media/docs/2011/07/chao.sealedrecords.pdf.

[50] Gorge Design Group LLC v. Xuansheng, 21-1695 (Fed. Cir. opening brief filed Oct. 25, 2021).

[51] FRCP 65(b)(1)(A).

Electronic copy available at: https://ssrn.com/abstract=4381824

vigorously,[52] but the SAD Scheme shows that rightsowners can succeed with robo-filings.

Ex parte TROs generally should preserve the status quo until the defendant can appear,[53] but SAD Scheme ex parte TROs go much further—they dramatically change the status quo and can negate the need for further in-court proceedings. That highlights how SAD Scheme ex parte TROs are an inappropriate remedy.

*Limited Error Correction*. All ex parte adjudications face an increased risk of legal or factual mistakes. This is especially true in intellectual property cases.

First, IP rights often have indeterminate boundaries. It's natural for rightsowners to push their claims to those borders or beyond,[54] knowing that defendants will push back on overclaims. However, when defendants don't appear in court, and the borders aren't clear anyway, judges may accept the rightsowners' unrebutted overclaims.[55]

Second, courts routinely need extrinsic evidence to determine the validity and scope of IP rights, and a non-adversarial process won't produce this evidence.[56] For example, design patent infringement requires the adjudicator to carefully analyze the corpus of prior art. The rightsowner can't be trusted to provide this corpus; after all, they would immediately turn around and explain why the items should be ignored or distinguished. Judges may lack the technical expertise or research capacity to find the prior art themselves. Due to the inevitably incomplete

---

[52] *E.g.*, Reno Air Racing Ass'n., Inc. v. McCord, 452 F.3d 1126 (9th Cir. 2006).

[53] Granny Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers, 415 U.S. 423, 439 (1974) ("Ex parte temporary restraining orders are no doubt necessary in certain circumstances, but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.")

[54] *E.g.*, James Gibson, *Risk Aversion and Rights Accretion in Intellectual Property Law*, 116 YALE L.J. 882 (2007).

[55] Judges can push back and sometimes do. *See* Grumpy Cat Ltd. v. The Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations Identified on Schedule A Hereto, 1:22−cv−03216 (N.D. Ill. June 23, 2022) https://storage.courtlistener.com/recap/gov.uscourts.ilnd.416147/gov.uscourts.ilnd.416147.24.0.pdf ("Some of the accused products likely infringe plaintiff's trademarks or copyrights, but the court is not persuaded that the accused products depicted in every submitted screenshot infringe. For example, [two screenshots] depict cartoon cats that are not the trademarked image and do not use the term Grumpy Cat. Plaintiff's submission does not explain how such images could reasonably be considered derivative of any copyrighted work (which are merely listed and not described). Not every frowning cartoon cat infringes; or at least plaintiff has failed to persuade that its intellectual property reaches that far").

[56] *See* Sarah R. Wasserman Rajec, *Patents Absent Adversaries*, 81 BROOK. L. REV. 1073 (2016).

Electronic copy available at: https://ssrn.com/abstract=4381824

set of prior art before the judge, "*ex parte* assessments of design patent infringement are likely to lead to significant over-enforcement."[57]

In SAD Scheme cases, any factual or legal errors by the court are unlikely to be corrected or appealed because so many defendants will settle, be voluntarily dismissed, or no-show.

For example, Emojico requested a default judgment against some defendants.[58] The court spotted Emojico's overclaim; it was improperly seeking to propertize a dictionary word. Nevertheless, the judge ignored the descriptive fair use statutory defense[59] in determining liability because the defendants did not raise the defense (they couldn't—they defaulted). Instead, the judge said descriptive fair use negated willful infringement and awarded statutory damages of "only" $25,000 against each defendant.

This conclusion is riddled with inconsistencies. If defendants qualified for descriptive fair use, the court should not have awarded any damages at all because the rightsowner's prima facie case failed. Yet, because the defendants defaulted, they are almost certainly not going to appeal the ruling. This leads to a legally unsupportable outcome that the standard judicial checks-and-balances won't fix.


## IV. WAYS TO ADDRESS THE SAD SCHEME

It's hard to know how often SAD Scheme lawsuits are legitimate and the optimal way for rightsowners to obtain redress. Are there ways to preserve the legitimate cases while curbing illegitimate ones? This part offers some ideas.

### A. Judicial Education

As described in Part III, the SAD Scheme depends heavily on judges credulously accepting rightsowner's unrebutted claims. Judges could easily curb abusive SAD Scheme lawsuits by scrutinizing rightsowners' filings more vigorously.

---

[57] *See* Sarah Burstein, *Guest Post: Against the Design-Seizure Bill*, PATENTLY-O (Jan. 3, 2020), https://patentlyo.com/patent/2020/01/against-design-seizure.html.

[58] Emoji Co. v. Individuals, Corporations, Ltd. Liab. Co., Partnerships, & Unincorporated Ass'n Identified on Schedule A, 2022 U.S. Dist. LEXIS 173321 (N.D. Ill. Sept. 26, 2022).

[59] 15 U.S.C. §1115(b)(4).

Electronic copy available at: https://ssrn.com/abstract=4381824

Yet, in the rare situations where defendants have pushed back against SAD Scheme cases, judges often disregard the pushback.[60] Further, Northern District of Illinois judges now have seen enough SAD cases to know about some of their problems, but the rate of SAD Scheme filings is still increasing (and Judge Pacold is still helping rightsowners file factually threadbare and overreaching filings). This suggests that judicial education alone may not cure SAD Scheme abuses.

B. Changes in Online Marketplace Policies

The SAD Scheme would likely evaporate if the online marketplaces did not honor ex parte TROs so expansively. As just one example, in theory, online marketplaces could freeze only the items and money associated with the allegedly infringing activity, not the entire account and all funds-in-possession. However, so long as online marketplaces fear their own liability exposure, they don't have enough incentives to make nuanced interventions. It's simpler and lower-risk for them to categorically shut down alleged infringers identified in the TRO.

C. Greater Use of Existing Legal Doctrines

The FRCP is flexible enough to adapt to new litigation techniques, and some existing provisions could help curb abusive SAD Scheme lawsuits:

*Defendant classes*. FRCP 23 contemplates that defendants can form classes, just like rightsowners do.[61] For example, a defendant class could bust the rightsowner's trademark or establish defenses like descriptive fair use. However, few individual defendants have enough motivation and resources to organize a class.

*Attorneys' fees awards*. Prevailing defendants may be awarded attorneys' fees in extraordinary patent or trademark cases[62] or at a judge's discretion in copyright cases.[63] Judges could also use other doctrines to protect defendants, such as FRCP 11 if rightsowner's counsel didn't properly do pre-filing investigations, misrepresented the situation to the judge, or made overly generic filings.

---

[60] *See, e.g.*, FN 45.

[61] *E.g.*, Robert R. Simpson & Craig Lyle Perra, *Defendant Class Actions*, 32 CONN. L. REV. 1319, 1323 (2000) (defendant class actions have been used in "various types of cases, including, but not limited to, patent infringement cases, suits against local officials challenging the validity of state laws, securities litigation, and actions against employers."); Francis X. Shen, *The Overlooked Utility of the Defendant Class Action*, 88 DEN. U. L. REV. 73 (2010); Assaf Hamdanid & Alon Klement, *The Class Defense*, 93 CALIF. L. REV. 685 (2005).

[62] 35 U.S.C. §285 and 15 U.S.C. §1117(a).

[63] 17 U.S.C. §505.

Electronic copy available at: https://ssrn.com/abstract=4381824

Fee-shifts can make mass IP enforcement less financially attractive[64] and compensate SAD Scheme defendants willing to fight back. Further, SAD Scheme cases should qualify as "extraordinary" cases for fee-shift purposes for the reasons outlined in Part III.[65]

Nevertheless, judges may reject discretionary fee shifts. One court explained the fee-shift denial:

> this case has followed the same trajectory of many other cases in this District and in districts throughout the country in instances where a plaintiff discovers that its intellectual property has likely been pirated and identical or substantially similar knock-off products are being offered for sale from on-line platforms. To hold that this case is exceptional would topsy-turvy that term— elevating what is ordinary to extraordinary. It would erect an unwarranted barrier to plausible claims by legitimately injured Plaintiffs[66]

The judge's pro-rightsowner sympathy is not unusual. It's a primary reason why judges might not use fee-shifts more aggressively in SAD Scheme cases, even when it's deserved. Plus, rightsowners could avoid fee-shifts by dismissing defendants voluntarily,[67] even though judges ought to keep those rightsowners on the hook to prevent strategic gaming.

*Bonds*. FRCP 65 says that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the

---

[64] For example, fee-shifts to defendants helped unravel Righthaven's mass copyright enforcements, Righthaven. *E.g.*, Righthaven LLC v. DiBiase, 2011 WL 5101938 (D. Nev. Oct. 26, 2011) ($120k in fees and costs); Righthaven LLC v. Wolf, 1:11-cv-00830-JLK (D. Colo. Sept. 27, 2011); Righthaven LLC v. Hoehn, 2:11-cv-00050-PMP –RJJ (D. Nev. Aug. 15, 2011) ($34k in fees); Righthaven, LLC v. Leon, 2011 WL 2633118 (D. Nev. July 5, 2011) ($3,800 in fees).

However, some over-aggressive rightsowners repeatedly bring ill-advised cases, even after fee-shifts and sanctions. See, e.g., Richard Liebowitz. https://en.wikipedia.org/wiki/Richard_Liebowitz.

[65] *See* Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545 (2014);

[66] Gorge Design Group LLC v. Syarme, No. 2:20-cv-1384 (W.D. Pa. Dec. 3, 2020).

[67] *Id.* (the rightsowner's voluntary dismissal meant that Neomagic technically didn't prevail).

My Emojico Declaration was filed after the rightsowner voluntarily dismissed the defendant. The court summarily denied the defendant's fee-shift request without explanation. Emoji Co. GmbH v. the Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations Identified on Schedule A Hereto, No. 21-cv-1739 (N.D. Ill. Mar. 23, 2022).

Electronic copy available at: https://ssrn.com/abstract=4381824

court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[68]

Courts set bond amounts at their discretion, but the amount should be high enough to accommodate the losses to all potentially affected parties, including the targeted merchants, the online marketplaces, and consumers.[69] Unfortunately, courts routinely undervalue bonds in SAD Scheme cases because they don't anticipate how much harm the ex parte TRO will cause.[70]

Bonds serve a key gatekeeping function. For example, after one court required a SAD Scheme rightsowner to tender a bond of $10,000 per defendant, the rightsowner dropped the number of defendants from 218 to 5 because the bond's 2% cost was too much.[71]

However, bonds suffer some of the same limitations as attorneys' fee shifts: dismissed/settled defendants aren't likely to request payment from the bond, and judges will be reluctant to make awards out of the bond that feel punitive to the rightsowner. While higher bond amounts could force rightsowners to evaluate their cases more carefully upfront due to the surety fee, more aggressive judicial

---

[68] FRCP 65(c).

[69] *See* Rathmann Group v. Tanenbaum, 889 F.2d 787 (8th Cir. 1989).

[70] Gorge Design Group LLC v. Xuansheng, 21-1695 (Fed. Cir. opening brief filed Oct. 25, 2021) ("Gorge's bond amounted to less than $130 per defendant, and for that it was able to seize over $300,000 of NeoMagic's funds and obtain an order allowing Gorge to take control of NeoMagic's online marketplace")

[71] Blue Sphere, Inc. v. The Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations Identified on Schedule A Hereto, No. 22-cv-5599 (N.D. Ill. plaintiff's statement filed Dec. 21, 2022). The rightsowner filed a new complaint against the 213 dropped defendants. *See* Blue Sphere, Inc. v. The Partnerships et al, No. 22-cv-6502 (N.D. Ill.). The first judge was not amused:

> Plaintiff's counsel engaged in that judicial rug-pulling sub silentio, without telling this Court or Judge Guzman what they were doing…Plaintiff's counsel later explained that they do not like this Court's bond requirements. So they decided to refile the case and get another judge….The Federal Rules and the U.S. Code allow a certain amount of forum shopping. But they do not allow judge shopping….Parties can pick their lawyers, and parties can pick their cases. But parties cannot pick their judges. Plaintiff's counsel cannot drop defendants, and then refile on behalf of those defendants, in an attempt to get what they perceive to be a greener judicial pasture.

Blue Sphere, Inc. v. The Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations Identified on Schedule A Hereto, No. 22-cv-5599 (N.D. Ill. Jan. 18, 2023).

Electronic copy available at: https://ssrn.com/abstract=4381824

management of bond requirements isn't likely to materially impact SAD Scheme cases.

D. Possible Statutory Reforms

Though it's unlikely that the SAD Scheme will prompt legislative reforms, it's worth evaluating some policy ideas:

 *Filing fees scaled to the number of defendants*. Enumerating lots of defendants in a single complaint is critical to the SAD Scheme's financial success. It would change the rightsowners' economic calculus if filing costs reflected this practice.[72] For example, the $402 filing fees could cover only the first X defendants, after which each additional defendant could cost another $402. If X were set high enough so that most legitimate cases qualify for the fixed pricing, this pricing change could easily cut back on abusive cases.

*Stronger presumptions against sealed defendant identities*. To emphasize that sealed defendant identities should be exceptional, the FRCP could impose heightened judicial scrutiny of cases with sealed defendant identities. For example: filing fees could be higher when the complaint has sealed defendant identities; rightsowners could be required to proactively disclose how often they have filed complaints with sealed defendant identities and how those cases resolved; judges could be required to take upfront extra steps to verify the legitimacy of sealing requests before a rightsowner can move forward; and the default rule could be that any sealed defendant identities automatically become unsealed within a statutorily specified number of days or weeks after filing unless the rightsowner shows an extraordinary need to keep the identities sealed.

CONCLUSION

Legal scholarship often emphasizes doctrinal omissions where existing laws do not adequately prevent anti-social behavior or provide adequate redress for victims. Those are important conversations, but they can sometimes overshadow the opposite problem of doctrinal commissions where existing laws produce unjust results.[73]

---

[72] *Cf.* Jonathan Masur, *Costly Screens and Patent Examination*, 2 J. LEG. ANALYSIS 687 (2010) (discussing how patent prosecution costs can screen out low-value applications),

[73] Eric Goldman, *Want To End The Litigation Epidemic? Create Lawsuit-Free Zones*, FORBES TERTIUM QUID blog (Apr. 10, 2013), https://www.ericgoldman.org/Speeches/caprivacylawsdec2013.pdf.

Electronic copy available at: https://ssrn.com/abstract=4381824

This paper contributes to the scholarship on doctrinal commissions. It shows how existing IP and civil procedure rules—which generally serve legitimate purposes—can nevertheless enable improper IP enforcements that create a long list of potential abusive litigation victims. Because the outcomes do not comport with due process and the rule of law, this doctrinal commission needs to be fixed.

Electronic copy available at: https://ssrn.com/abstract=4381824